B. R. ANDERSON & CO.

v.

UNITED STATES.

C. D. 2304.

United States Customs Court,
First Division.
Dec. 19, 1961.

Little, Palmer, Scott & Slemmons, Seattle, Wash. (Herbert S. Little and Marvin B. Durning, Seattle, Wash., of counsel) for plaintiff.

William H. Orrick, Jr., Asst. Atty. Gen. (Murray Sklaroff and Sheila N. Ziff, trial attys., New York City), for defendant.

Before OLIVER, MOLLISON, and WILSON, Judges.

MOLLISON, Judge.

The 14 protests enumerated in the attached schedule are directed against the action of the collector of customs in assessing duty on merchandise which is described on the invoices, entries, and protests as "limestone spalls" at the rate of 1¼ cents per 100 pounds under the provision in paragraph 203, Tariff Act of 1930, as modified by T.D. 51802, 19 U.S.C.A. § 1001, par. 203 for—

"Limestone (not suitable for use as monumental or building stone), crude, or crushed but not pulverized."

Alternative claims are made in each of the protests for classification under other provisions of the tariff act as follows:

[Free of duty under the provision in paragraph 1719, 19 U.S.C.A. § 1201, par. 1719 for]: ·

"Minerals, crude, or not advanced in value or condition by refining or grinding, or by other process of manufacture, not specially provided for."

For duty at the rate of 4 per centum ad valorem under the provision in paragraph 1555 of the said act, as modified by T.D. 52739, for—

"Waste, not specially provided for."

For duty at the rate of 15 per centum ad valorem under the provision in paragraph 214 of said act, as modified by T.D. 51802, for—

"Earthy or mineral substances wholly or partly manufactured * * not specially provided for * * * Other [than certain named substances not here involved]."

The claim for classification under paragraph 214 is pressed on two separate grounds. First, that as between classification under paragraph 203 and under paragraph 214, the latter is the correct classification of the merchandise under the substantive law, and, second, that the classification of the merchandise under paragraph 203, supra, was illegal and void, inasmuch as such classification rep-

resented a change from an established and uniform practice of classifying such merchandise under paragraph 214, and that such change of practice was not taken in accordance with the provisions of section 16.10 of the Customs Regulations.

Finally, claim is made for classification under the nonenumerated manufactured articles provision in paragraph 1558 of the tariff act, as modified by T.D.'s 52739 and 52827.

Prior to taking up the foregoing claims, there is another matter which must be disposed of. This concerns a motion made by counsel for the defendant to dismiss protests Nos. 60/28437, 60/28438, and 60/28439, on the ground that they were untimely filed, and, accordingly, disposition will first be made of that matter.

The Issue as to Timeliness of Protests 60/28437, 60/28438, and 60/28439

The 3 protests above enumerated, along with 11 protests as to which there is no question of timeliness of filing, relate to entries of merchandise made at various times during 1958, 1959, and 1960, all of which were liquidated on April 29, 1960. The 60th day after that date was June 28, 1960, and was the last day on which timely protests against the said liquidations could be filed under the provisions of section 514, Tariff Act of 1930, 19 U.S. C.A. § 1514.

It is the sworn testimony of the customhouse broker, Milton C. Guerringue, associated with the plaintiff in these cases, that, in response to a notice of additional duties due resulting from the liquidations of April 29, 1960, he caused to be issued by the cashier of his firm a check in favor of the collector of customs in payment of all such duties due under the said liquidations; that, at the same time, he caused to be prepared 14 protests against the liquidations of the entries involved; that he, personally, checked each entry number against the protests so prepared, and the total protests with the total duty paid, to determine that he had a protest covering each entry involved; that,

on June 24, 1960, he, personally, took the check and the protests to the collector's office; that he deposited the check with the teller or cashier in the Monies and Accounts Division; and that he deposited the protests in a box provided for that purpose on top of the entry counter in the collector's office.

Mr. Guerringue further testified that, as drawn by the cashier of his firm and as presented to the cashier in the Monies and Accounts Division, the check contained a notation "Paid under protest as per protests dated June 24, 1960"; that five copies of each protest, i. e., an original and four copies, were prepared for filing with the collector and a sixth retained in his office; that two of the five copies deposited with the collector were to be returned to him showing evidence of receipt; that, normally, the receipted copies are returned in approximately a week; that upon the return of some receipted copies of protests within a week after the foregoing events, he sent them to counsel for the plaintiff without counting them; and that his first knowledge that something was wrong was when he was later advised by counsel that three of the protests were missing.

Further, that he examined the files in his office and found his original copies of all 14 protests, including the 3 missing protests; that inquiry and investigation in the collector's office revealed that there was no record there of the protests having been filed; and that he caused to be made up duplicates of the missing protests and brought them to the collector's office on August 5, 1960.

It appears from the testimony of Clarence M. Dolgner, the deputy collector of customs at the port of Seattle, Wash., in charge of the Entry and Liquidating Division, that, upon the presentation to him of the three duplicate protests on August 5th, he refused to accept them because of untimeliness; that he immediately, and several times thereafter, caused checks or searches to be made of the records and contents of the office to determine whether the original protests were in existence

in the office; and that the original protests were not found.

It further appeared that, under the procedure existing in the office at the time in question, protests were deposited in the box on the entry counter, previously referred to, and that as soon as possible they were removed therefrom and time-stamped and processed by the protest clerk. Competent assistance was present at all times in the office.

The record indicates that, because of the untimeliness of the protests that were presented to him on August 5th, the deputy collector did not act upon them other than to assign a number and transmit them, together with the entry papers to which they related, to this court.

The testimony of Mr. Guerringue is very detailed, and while there is no corroboration of the fact of his actually depositing the protest papers in the entry box, we are satisfied from the record that the plaintiff, through its representative, did everything in its power to effectuate a timely filing of protests against the liquidations of the entries in question. The court cannot solve the mystery of what happened to the protests. Its only function is to determine, from all of the available evidence, whether they were physically in existence and were or were not timely filed. In holding, as we do, that the missing protests were physically in existence on June 24, 1960, and that they were timely filed in the collector's office, we make no finding as to fault of any person involved in the matter, nor is any criticism intended of any act or procedure followed in this case by either the plaintiff or defendant, or their representatives.

Accordingly, the motion to dismiss the three protests, hereinbefore enumerated, is denied.

The Issue as to the Classification of the Merchandise Under the Substantive Provisions of the Tariff Act of 1930

Funk & Wagnalls New Standard Dictionary, 1930 edition, defines "limestone" as "A rock composed wholly or in part of calcium carbonate." There seems to be no question but that the term "spalls" is an imprecise, general term, which, as counsel for the plaintiff states in the brief filed in its behalf, is "used by different persons or the same person at different times to describe rock of possibly quite different nature." Its dictionary definition is "A chip, splinter, or flake" (Funk & Wagnalls, op. cit.), which does not wholly describe the merchandise at bar.

The evidence offered, in the case at bar, establishes that as limestone occurs in nature it is in the form of deposits of varying calcium carbonate content and containing varying amounts of impurities. The calcium carbonate content and the amount and type of impurities present determine whether the limestone may be used for certain purposes, e. g., for burning in a kiln to produce lime, or for use in making paper by the sulphite process, or as a flux in steel making and other industries, or in the manufacture of Portland cement, etc.

It appears that the exporter of the merchandise in the cases at bar maintains and works a limestone quarry in British Columbia and that its principal business is the manufacture and sale of lime, although it also sells limestone to the pulp and other industries.

The main products desired by the exporter from its quarry are so-called "kiln rock," which it uses in the production of lime by burning in vertical-type kilns, and so-called "sized rock," which is used in pulpmills and other places for producing lime by the use of horizontal, rotary kilns, and in steel mills as a flux in the production of steel.

For these purposes, the limestone which the exporter desires is required to contain at least 96 to 98 per centum calcium carbonate and be free of all but the smallest traces of impurities, especially manganese. Limestone of this high calcium and low impurity content is referred to by the exporter and its employees as "high quality" or "calcining" limestone.

In quarrying operations, to obtain such limestone, it frequently happens that it is necessary to take out limestone of lower

quality in order to get at the high quality limestone. Also, certain material which is not limestone at all, called "dike material," is found in association with the limestone and must be taken out.

At times when there is no demand for the low quality limestone, it and the dike material are dumped along the roads or in the woods and abandoned. Insofar as the particular quarry of the exporter in the case at bar is concerned, the only demand for such material comes from the ultimate consignee of the shipments here involved, an American firm which uses the material in the manufacture of Portland cement.

The high and low quality limestones are kept separated from one another after being taken from the quarry, and, in the ensuing operations, that separation is maintained, the machinery involved being used either for processing high quality stone or low quality stone, but never a mixture of the two.

The low quality stone forms approximately 80 per centum by weight of the merchandise at bar, and, after quarrying, is crushed in a jaw crusher so that no piece is over 8 inches in one dimension. From there, it goes through a screening operation, and all pieces from 2 inches in greatest dimension to 8 inches in greatest dimension are broken to the 2-inch size in an impact breaker. All pieces less than 2 inches in greatest dimension bypass the breaker, and, together with the output of the breaker, are placed in what is known as the "spalls pile."

When operating on the high quality limestone, the same machinery breaks and screens it into kiln rock size, 4 to 8 inches in greatest dimension, into No. 2 size rock, 1 to 1½ inches in greatest dimension, and into No. 1 size rock, ⅜ to 1 inch in greatest dimension. Material smaller than three-eights of an inch is called "fines" and is placed on the spalls pile.

The result of calcining or burning the kiln rock in a kiln is made into lime by pulverizing. Also added to the spalls pile is a comparatively small amount of what are known as "lime cores," which are pieces of kiln rock which, for one reason or another, were inadequately burned in the lime kiln and are rejected for the purpose of making lime.

It will be seen, therefore, that the spalls pile consists of pieces of low quality limestone, 2 inches or less in greatest dimension, fines of high quality limestone, less than three-eighths of an inch in greatest dimension, and lime cores. In other words, as put by counsel for the plaintiff in the brief filed in its behalf, it consists of all the limestone produced by the exporter, which, by virtue of quality and/or size, is unusable for lime burning or for sale to the exporter's pulp or steel mill customers.

The imported merchandise comes from this pile, and it is required that each shipment contain not less than 85 per centum of calcium carbonate.

As has been noted, the collector classified the merchandise at bar under the provision in paragraph 203, supra, for—

"Limestone (not suitable for use as monumental or building stone), crude, or crushed but not pulverized."

There does not seem to be any question but that, in its common acceptation, the term "limestone" is one covering a broad range of naturally occurring rock, consisting chiefly of calcium carbonate. One of plaintiff's witnesses placed the calcium carbonate of limestone as 85 to 90 per centum, or higher, with "not too much other impurities in it, depending on the use to which limestone is going to be put." (Tr., pp. 63–64.)

It is clear that, while the quality of the merchandise in the cases at bar is such as would prevent its use for lime burning, nevertheless, it is bought, sold, and used for one of the purposes for which limestone is used, i. e., the manufacture of Portland cement. The plaintiff does not deny that the merchandise at bar is not suitable for use as monumental or building stone, or that it has not been further advanced than crude or crushed. In fact, it does not appear that the plaintiff seriously disputes that the merchandise at

bar is limestone, within the common meaning of the term.

■ It should be noted, at this point, that counsel for the parties are in agreement that the fact that the merchandise at bar has been called "spalls" does not affect or bear upon the classification of the material for tariff purposes, inasmuch as the term "spalls" may also apply to rock of different nature. (Plaintiff's brief, p. 25; defendant's brief, p. 8.)

However, plaintiff does deny that the limestone at bar is the kind of limestone which was intended by the legislature to be covered by the provision in paragraph 203, under which the collector classified it. Plaintiff contends that the provision was intended to apply only to the high quality limestone, which is the raw material of the lime industry, i. e., limestone of the quality suitable for lime-burning purposes.

To that end, plaintiff has cited and quoted certain legislative history of the provision in the Tariff Act of 1922, which was the immediate predecessor, in the same language, of paragraph 203 of the present act, as well as a history of the times when that provision was under consideration by the Congress, with special reference to the then-existing situation of the lime industry, which it is claimed was sought to be remedied by the proponents of the legislation, a comparison of the costs of high quality limestone and of the material at bar, and the classification and rate structure of paragraph 203, supra, and its position in schedule 2 of the tariff act, covering earths, earthenware, and glassware.

In short, plaintiff seeks to have applied to the language of the provision here in question a meaning different from its common meaning, and one which would exclude the merchandise at bar.

■ It is elementary that the master rule in the construction of tariff statutes is so to interpret them as to carry out the legislative intent. The primary source of information as to the legislative intent is the statute itself. In Lake County v. Rollins, 130 U.S. 662, 670, 9 S.Ct. 651, 652, 32 L.Ed. 1060, 1063, the Supreme Court said:

"To get at the thought or meaning expressed in a statute, a contract, or a constitution, the first resort, in all cases, is to the natural signification of the words, in the order of grammatical arrangement in which the framers of the instrument have placed them. If the words convey a definite meaning, which involves no absurdity, nor any contradiction of other parts of the instrument, then that meaning, apparent on the face of the instrument, must be accepted, and neither the courts nor the legislature have the right to add to it or take from it. * * * So, also, where a law is expressed in plain and unambiguous terms, whether those terms are general or limited, the legislature should be intended to mean what they have plainly expressed, and consequently no room is left for construction."

■■ First inquiry here, therefore, must be whether the statute as written is or is not plain and unambiguous. The brief filed on behalf of the plaintiff does not address itself to that question, but we may say that, generally speaking, ambiguity may appear from a consideration of the statutory language itself, as where, standing alone, a word or a term is susceptible of at least two meanings, neither of which may be ruled out as leading to absurd or unconscionable results. United States v. Invicta Seeland, Inc., 25 CCPA 300, 305, T.D. 49397; Crooks v. Harrelson, 282 U.S. 55, 51 S.Ct. 49, 75 L.Ed. 156. Even where the statutory language of a provision, standing alone, may be plain and clear, nevertheless, ambiguity may be apparent when it is considered in connection with other language in the same statute which, by its terms, includes the same subject matter, or when it is considered in connection with the statute as a whole. United States v. E. De Grandmont, Inc., 21 CCPA 17, T.D. 46345; United States et al. v. American Trucking Associations, Inc. et al., 310 U.S. 534, 542, 60 S.Ct. 1059, 84 L.Ed. 1345.

■ With one exception, all of the matters cited by the plaintiff to evidence the intent of Congress to limit the meaning of the term "limestone" in paragraph 203 to high quality limestone are matters extraneous to the statute, and while some of such matters may be resorted to in order to determine the intent of the legislature *when it has first been found and held that the statutory language is ambiguous,* they may not be used to establish the existence of ambiguity when ambiguity does not appear from a consideration of the statute itself. In other words, resort to aids extraneous to the statute is proper to resolve an ambiguity, but not to establish that ambiguity exists. Universal Transcontinental Corp. v. United States, 40 CCPA 54, C.A.D. 497.

The only matter cited by the plaintiff within the framework of the statute itself which might be considered as bearing on the point of possible ambiguity of the statutory language in question is the suggestion that the structure of paragraph 203 indicates that it was directed toward imposing graduated rates of duty upon the basis of a progression from raw material to finished products. In this connection, plaintiff points out that the lowest rate is imposed upon the raw material, limestone, and then progressively higher rates are imposed upon the products manufactured therefrom, lime and hydrated lime, in accordance with the stage of manufacture of the products. Hence, plaintiff concludes that the provision for limestone in paragraph 203 is susceptible of being construed as not covering all limestone, but only limestone suitable for manufacture into lime, i. e., high quality limestone.

■ We are of the opinion that a consideration of the structure of paragraph 203 in accordance with the foregoing indicates that the provision for limestone therein contained may reasonably be susceptible of two meanings—one, its common meaning, covering all limestone, both of low and high quality, and the other meaning, as contended for by the plaintiff, covering only high quality limestone —and, consequently, that the language of the provision is ambiguous in meaning. Recourse is, therefore, warranted to an examination of the legislative history of the provision in order to resolve the ambiguity.

In our opinion, however, an examination of the matters offered by the plaintiff as aids in determining the legislative intent shows that such matters do not resolve any ambiguity in the statute, and, further, such aids as the court has been able to consult indicate that the language was intended to have its common meaning, that is to say, to include all limestone, both of low and high quality.

Plaintiff has cited and quoted from the following sources of legislative history:

Tariff Information Survey B–2 on Lime, Gypsum & Cements (revised edition, U.S. Government Printing Office, 1921), prepared by the United States Tariff Commission and transmitted to the Committee on Ways and Means of the House of Representatives at the time when revision of the Tariff Act of 1913 was under consideration.

Summary of Tariff Information, 1920, prepared by the Tariff Commission for the use of the said committee of the House.

Hearings on General Tariff Revision before the Committee on Ways and Means, House of Representatives, part 1, United States Government Printing Office, 1921, pages 378–439.

Summary of Tariff Information, 1921, prepared by the Tariff Commission for the use of the Senate Committee on Finance.

Hearings before the Committee on Finance, United States Senate, on the proposed Tariff Act of 1921, H.R. 7456, schedule 2, United States Government Printing Office, 1922, pages 1370–1377.

We find nothing in the foregoing matter which would establish or even indicate that it was the intention of Congress, in enacting paragraph 203 of the Tariff Act of 1922, the predecessor in identical language of paragraph 203 of the present act, to limit the limestone therein provided for to the high quality limestone suit-

able for lime burning. On the contrary, it appears that, at all times, Congress was aware of the fact that limestone, not suitable for use as monumental or building stone, was used for other purposes besides lime burning. Note page 786, Summary of Tariff Information, 1920, and page 263, Summary of Tariff Information, 1921, indicating uses in concrete, alkali works, flux, road making, riprap, sugar, glass, and paper factories, agriculture, etc.

Although Congress, apparently in response to the matter brought out at the hearings by the proponents of increased duties on lime and the imposition of duties on broken, crushed, ground, and pulverized limestone, did provide for higher duties on lime and transferred limestone, not suitable for use as monumental or building stone, from the free to the dutiable lists, it does not appear that it adopted either the language or the rates suggested by the proponents. We do not think that the action of the Congress can be considered to be definitely referable to an intent to confine the provision for limestone in paragraph 203 to high quality limestone, suitable for lime burning.

Nor do we discern any such intent from a consideration of the structure of paragraph 203 or of schedule 2 of the tariff act, 19 U.S.C.A. § 1001, pars. 201 et seq., 203. While these matters indicate ambiguity in the statute, they do not, either standing alone, or in connection with any other matter cited to us, provide any positive evidence of the legislative intent.

The citation of commercial considerations, chiefly a comparison of costs of high and low quality limestone, and the history of the times when the original statute was enacted, which history relates to the use of low-cost labor in Canada, the use of low-cost foreign shipping, high Canadian tariffs, and lack of American production of limestone, such as that here in question, are matters which are properly addressed to the legislative rather than the judicial function. If, as alleged by plaintiff herein, the foregoing considerations have been altered since the tariff was first enacted and tariff relief is called

for, the remedy is not in this forum, and we do not find that such considerations evidence the legislative intent contended for by the plaintiff.

■ Where matters extrinsic to a statute are resorted to for the purpose of arriving at the intent of the legislature in the enactment of the statute, we think that, in order to control the construction of the statute and the interpretation of its language, the extrinsic aids consulted must be authoritative, i. e., express the will of the legislature, and conclusive, i. e., leave no question as to what the intent of the legislature was.

In United States v. Kung Chen Fur Corporation, 188 F.2d 577, 38 CCPA 107, C.A.D. 447, our appellate court made the following pertinent observations:

"We indulge the further observation that matter relating to legislative history, which matter itself requires construction in order to understand it, is of no great aid to a court in construing a statute to which such matter purports to relate.

"Furthermore, not everything which may bear some relation to the formation and enactment of a statute is pertinent to the legislative history of that statute. Congress has not delegated to unofficial individuals or organizations, which may appear before one of its committees advocating legislation, the authority to construe for it and the public statutes which it enacts. Courts have the authority to do that."

■ Accordingly, we find and hold that the provision in paragraph 203, Tariff Act of 1930, as modified, for "Limestone (not suitable for use as monumental or building stone), crude, or crushed but not pulverized" was intended by the Congress to refer to limestone within the common meaning of the term; that the said provision embraces merchandise of the character of that at bar; and that the latter is properly classifiable under said provision.

The provision for limestone in paragraph 203, supra, is an *eo nomine* desig-

nation. Each of the provisions of the tariff act under which the plaintiff claims the merchandise should have been classified, i. e., paragraphs 1719, 1555, 1558, and 214, are provisions of more general description or are broader in scope than the provision for limestone in paragraph 203. They are relatively less specific in their application to the merchandise at bar than the provision under which the merchandise was classified by the collector, and, consequently, paragraph 203 controls its classification, unless it should be held that plaintiff's contention with respect to the illegality of that classification is valid. We, therefore, proceed to a determination of that claim.

The Issue as to the Claimed Illegality of the Classification, by Reason of Failure to Comply With Applicable Customs Regulations Concerning Change of Practice

Although not so stated, the theory of the claim upon the above ground apparently is that the classification made by the collector in the cases at bar was a nullity, because the collector was not empowered to make it. Thus, it is contended that if there is an established and uniform practice in existence at the various ports of the United States with respect to the classification of certain imported merchandise, collectors of customs may not depart from such practice by changing the classification of such merchandise when such change results in the imposition of a higher rate of duty (1) without instructions from the Bureau of Customs, and (2) prior to the expiration of 90 days after the publication of such instructions in the Treasury Decisions.

Section 16.10(a) of the Customs Regulations, entitled "Change in classification or value; higher or lower rate; effective date," so far as pertinent, reads as follows:

"If there is an established and uniform practice at the various ports, a change in classification resulting in a higher rate of duty, except as the result of a court decision, shall be made only upon the Bureau's instruc-

tions and shall be applicable only to merchandise entered for consumption after the expiration of 90 days after the date of the publication of the Bureau's instructions in the Treasury Decisions. * * *"

It is clear that this regulation was issued pursuant to section 315(d) of the Tariff Act of 1930, as amended by the Customs Administrative Act of 1938 and the Customs Simplification Act of 1953, 19 U.S.C.A. § 1315(d), which provides that—

"No administrative ruling resulting in the imposition of a higher rate of duty or charge than the Secretary of the Treasury shall find to have been applicable to imported merchandise under an established and uniform practice shall be effective with respect to articles entered for consumption or withdrawn from warehouse for consumption prior to the expiration of thirty days after the date of publication in the weekly Treasury Decisions of notice of such ruling; but this provision shall not apply with respect to the imposition of antidumping duties."

Plaintiff contends that its evidence has established that merchandise, such as that at bar, was imported only at the ports of Seattle and Tacoma; that at those ports, from 1946 until the date of the earliest entry in the case at bar, there was an established and uniform practice of classifying such merchandise under the provision for partly manufactured earthy or mineral substances in paragraph 214 of the Tariff Act of 1930, and that, although plaintiff does not know whether the change in practice was made upon instructions of the Bureau of Customs, it is a matter of public record that no publication of such instruction was made in the Treasury Decisions.

Defendant contends that the plaintiff has failed to establish any of the facts stated, or any facts sufficient to support a claim under the Customs Regulation enumerated.

**328**

It is essential to the success of any action based upon the cited and quoted provisions that it be found that an "established and uniform practice" existed with respect to the classification of the merchandise involved. This element of the law was the subject of decision by our appellate court in the case of Washington Handle Co. v. United States, 34 CCPA Customs 80, 85–87, C.A.D. 346. The facts in that case, as outlined in the court's opinion, are so similar to those in the case at bar that we would not be warranted in departing from the holding therein reached by the court, that under such circumstances no established and uniform practice had been demonstrated to have existed. However, compare the decision in Henry Clay & Bock & Co., Ltd. v. United States, 41 CCPA Customs 45, C.A.D. 527, for a different approach to a somewhat analogous problem.

On the record presented, we have no course other than to overrule the claim.

Before concluding this opinion, we think it appropriate to note that the briefs in the case are silent on the issue of segregation or commingling of merchandise. Nevertheless, there is found among the papers plaintiff's exhibit 20, which refers to certain declarations concerning the percentages of high and low quality limestone contained in the shipments here under protest. See transcript of testimony, pages 128–129. Compare United States v. Holler, 28 CCPA Customs 124, C.A.D. 133, and United States v. Washburn-Crosby Co., 14 Ct.Cust.App. 243, T.D. 41874. Compare also, in this respect, Lawder v. Stone, 187 U.S. 281, 23 S.Ct. 77, 47 L.Ed. 178. However, as the issue as to commingling of merchandise does not appear to be pressed, no further reference will be made to it.

For the reasons hereinbefore expressed, all of the protest claims are overruled, and judgment will issue accordingly.